UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                    :
MICHAEL WILSON,                                     :
                                                    :
                        Petitioner,                 :      **MEMORANDUM AND ORDER**
                                                    :
        - against -                                 :          05-CV-1208-ENV
                                                    :
WILLIAM PHILLIPS, Superintendent, Green             :
Haven Correctional Facility,                        :
                                                    :
                        Respondent.                 :
                                                    :
-----------------------------------------------------------------X

**VITALIANO, D.J.**

Petitioner Michael Wilson seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254

challenging his state court conviction for murder in the second degree. The petition is grounded

on two theories of relief: (1) the trial court deprived him of due process by refusing to charge the

jury on the affirmative defense of extreme emotional disturbance, and (2) his trial counsel,

Calvin Simons, performed inadequately in violation of the rule announced in Strickland v.

Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). For the reasons set forth below, Wilson's

writ is denied and his petition is dismissed.

### Background

Shortly before midnight on April 20, 2000, Saleh Abudala Yafa was shot three times in

the chest and fatally wounded while working at a bodega located at 603 Flatbush Avenue in

Brooklyn. Based on information received from the store owners, brothers Mahmood and Ali

Albusaisi, and from Wilson's friend, Teisha Morgan, the police arrested Wilson for the crime.

On January 4, 2001, following a jury trial in Supreme Court, Kings County, Wilson was

convicted of murder in the second degree, N.Y. Penal Law § 125.21(1), and petit larceny, N.Y.

Penal Law § 155.25. He received a conditional discharge on the larceny count and is currently serving a sentence of 25 years to life imprisonment on the murder count.

## I.   Events Leading to Arrest

The evidence adduced at trial established that Wilson had been selling drugs at the bodega for a couple of months prior to the night of the shooting. The owners' attempts to prevent Wilson from dealing in the store had led to a series of confrontations. On March 20, 2000, Wilson pointed a pistol in Mahmood Albusaisi's face and told him that he would not stop using the store to deal drugs.[1] (Transcript of Record, People v. Wilson, Indict. No. 3814/00 (Kings County Ct. 2000) ("Trial Tr.") at 37-38.) Ali Albusaisi testified that on the afternoon of April 19, 2000, one day before the shooting, Wilson entered the bodega and removed drugs from his pants, placing them on the ice cream freezer next to the cash register. (Id. at 132.) When ordered to leave, Wilson threw a bottle that broke a shelf near the cash register, provoking a fight with Yafa, who was also working the afternoon shift. (Id. at 133-34.) Wilson was beaten and lost two beepers during the scuffle. By the time the police arrived, Wilson had already left, and police attempts to track him down were unsuccessful. (Id.)

Later that night, Wilson attended a social gathering at the apartment of Teisha Morgan, where he, Morgan, her brother Nicholas, and her boyfriend Usher smoked marijuana, drank beer, and played video games. (Id. at 244-50.) Morgan, who testified for the prosecution, observed that Wilson was injured and very upset because "Arabs jumped him and fucked him up". (Id. at 226.) When Wilson told her that he "wanted to kill the fucker", (id. at 228), Morgan suggested that Wilson instead retaliate by bringing friends with him to the store to beat up Yafa. (Id. at

---

[1]   The trial court did not submit to the jury a charge of menacing based on the March 20 incident because it was "not that clear-cut" and did not "add[ ] anything to this case". (Trial Tr. at 304.)

2

229.) However, Wilson would not be dissuaded, stating again "I'm a [sic] kill the mother fucker" (id. at 249), and that he was "ready to go to jail". (Id. at 233.)

The following morning, April 20, Wilson returned to the bodega with a friend and stole two six-packs of beer in retaliation for the lost beepers. (Tr. at 229-30.) Mahmood, who was working alone, did not attempt to stop Wilson, but called the police afterwards. (Id. at 41.) Later that evening, Wilson returned to the store, but Yafa attempted to prevent him from entering, leading to another fight between the two. (Id. at 149.) After this altercation, Yafa once again called the police and, upon arrival, the responding officers went looking for Wilson. (Id. at 134.) Forty-five minutes later, Wilson returned to the store, stood outside for 15 minutes, left, and then came back again after an hour and a half. (Id. at 155, 158.) At around midnight, Ali saw Wilson push open the door and shoot Yafa three times in the chest, killing him. (Id. at 124.)

At around 1:00 A.M., Morgan ran into Wilson at another store and they returned to her apartment. (Id. at 253-55.) Wilson told her that he was once again jumped by the "Arabs", and that one of them had swung a machete at his head. (Id. at 230.) Wilson then said that he shot one of the men and that "he's fucking dead". (Id. at 259.) Morgan testified that she first heard about the shooting from her brother, but, she said, "I made pretend that I didn't know that [Wilson] shot the guy because [my brother] said not to say nothing". (Id. at 257.) Wilson spent the rest of the night at Morgan's apartment. (Id. at 259.)

Wilson was arrested at his cousin's apartment at 11:20 A.M. on April 22. (Id. at 173.) When questioned by police, Wilson denied any knowledge of the shooting, but admitted that he had been in a fight with "three Arabs" at the store and that he stole beer in response to the loss of his beepers. (Id. at 181-83.) Wilson told police that at the time of the shooting he was with his girlfriend and then went directly to his cousin's apartment, where he remained until his arrest.

(Id. at 181.) Later that day, in two separate police lineups, Ali identified Wilson as Yafa's killer (id. at 131), and Mahmood identified Wilson as the beer thief. (Id. at 43.) Wilson was subsequently indicted for two counts of murder in the second degree (intent to cause death and depraved indifference murder) and four lesser charges.

## II.  **Wilson's Trial Defense**

The defense's theory was that, although Wilson had fought with the "Arabs", he never displayed a firearm or shot Yafa. Rather than present affirmative testimony proving an alibi, defense counsel Calvin Simons's primary strategy at trial was to attack the credibility of the prosecution's witnesses through cross-examination. For example, Simons attempted to show that Morgan was too inebriated to accurately recount her conversations with Wilson and that the store owners did not get along with other community members. Wilson never took the stand in his own defense, but Simons called two police officers to testify. First, he sought to impeach Morgan by presenting testimony from Detective Jose Santiago, who may have interviewed Morgan at the time she claimed to have heard Wilson's confession.[2] Simons also called Officer Spencer Bonomo to show that Ali's physical descriptions of the assailant to the police were inconsistent with Wilson's appearance. (Id. at 284.) Simons then argued in summation that the prosecution's witnesses were biased; Morgan was looking to protect her brother, who was also arrested (id. at 348), while the Albusaisi family had a vendetta against Wilson. (Id. at 341.)

### A.    The Pre-Trial Evidentiary Hearing

Before trial, the court conducted a Huntley and Wade hearing in which Simons argued for suppression of the police lineup identifications and Wilson's videotaped statement to the Assistant District Attorney. Although the court had initially denied the defense's request for a

---

[2]  As Simons had drawn out on cross-examination of Morgan, there was some confusion in her testimony as to whether Wilson confessed to her on the morning of April 21 or April 22.

Dunaway hearing, it ultimately heard argument on that motion because the prosecution adduced evidence relevant to whether Wilson's statements to police should be suppressed for lack of probable cause for his arrest. (Transcript of Hearing, People v. Wilson, Indict. No. 3814/00 (Kings County Ct. Apr. 16, 2000) ("Hr'g. Tr.") at 69-73.) At the hearing, Simons cross-examined officers who testified as to their roles in the Yafa investigation, but he called no other witnesses. With respect to the Dunaway motion, he argued that since the police lineups did not take place until after Wilson's arrest, the police solely relied on their interview of Morgan, which alone was insufficient to establish probable cause. (Id. at 88-89.)

The hearing court denied the Dunaway motion, finding that "as to whether the defendant was taken into custody with probable cause, there is really no issue about that" because the police knew of a shooting, learned that Wilson confessed to their witness, and observed that witness identify Wilson by photograph. (Id. at 96.) The court also denied the motion to suppress the lineup identification because it found that the substance and process of the lineup was fair. (Id.) Simons was successful, however, in persuading the Court to suppress Wilson's videotaped statement, because it was taken after Wilson declared that he wanted an attorney. (Id. at 97-98.)

B.     The Charge Conference

At the charge conference, the trial court agreed to submit manslaughter in the first degree to the jury. (Trial Tr. at 305.) Simons followed up by requesting a charge of the affirmative defense of extreme emotional disturbance ("EED"), based on "testimony from Miss Morgan that Mr. Wilson was very upset from the beating, from the assault, and all he talked about was this, and that followed through to the shooting on the next day." (Id. at 305-06.) The trial court explained that there were two ways of charging the jury on manslaughter in the first degree: by showing that the intent was merely to cause serious physical injury, or by acknowledging the

intent to kill but finding EED. (Id. at 306.) Simons argued that although he wanted instructions on both theories, the EED theory would be more applicable. (Id. at 307-08.) The prosecution agreed that the EED theory "is more fitting under the facts" and stated that, while it was "unusual", "if [defense] is requesting it, I don't think I can oppose" the instruction. (Id. at 309.)

The court, however, expressed concern that, even though the evidence may have pointed to "retaliation anger" (id. at 308) and "desire to . . . seek revenge" (id. at 310), it did not point to EED, which usually would be supported by "evidence from either the defendant himself or from a doctor that the defendant was . . . disturbed as opposed to angry." (Id. at 308.) After reviewing the relevant New York statute, the court held the charge inappropriate:

> But on the issue of extreme emotional disturbance, there's never been any mention to this jury at any time in this trial . . . nor any defense case relating to extreme emotional disturbance. . . . And I think it's very confusing for a jury to have to grapple with an issue of this kind for the first time when no mention has been made at any time before and when the sole witness that's being offered to support this is a prosecution witness who was called to give a confession made by the defendant at which he was very angry at the person who became the alleged intended victim. And to elevate that into an affirmative defense of extreme emotional disturbance I think is a real stretch and a real reach, and I think more was required of the defense in this case to inject that issue into this trial than her statement while he was at her house drinking beer, smoking marijuana and playing video games . . .

(Id. at 313-14.) The court ultimately submitted the manslaughter charge to the jury on the theory that there was only intent to seriously injure, but it acknowledged that "the evidence is very strong on the intent to kill". (Id. at 315.)

## III. Post-Trial History

### A. Direct Appeal

On October 6, 2003, the Appellate Division, Second Department unanimously affirmed Wilson's conviction, rejecting his arguments that the trial court had improperly denied his request to charge the jury on EED and that his sentence was excessive. People v. Wilson, 309 A.D.2d 775, 765 N.Y.S.2d 259 (2nd Dep't 2003). The court held, without further elaboration,

6

that "a rational jury could not have determined from the evidence that at the time of the shooting, the defendant was acting under the influence of an extreme emotional disturbance." Id. at 776. The court also ruled that Wilson's remaining contentions, including a claim in his *pro se* supplemental brief that the trial court erred in denying his Dunaway motion, were "unpreserved for appellate review and, in any event, without merit." Id. Wilson's application for leave to appeal that decision was denied by the Court of Appeals on December 4, 2003. People v. Wilson, 1 N.Y.3d 582, 775 N.Y.S.2d 798, 807 N.E.2d 911 (2003).

      B.      Collateral Attack In State Court

On February 10, 2005, Wilson filed a *pro se* § 440.10 motion in Supreme Court, Kings County to vacate his conviction by reason of ineffective assistance of counsel. Wilson argued that Simons failed to: (1) investigate and interview witnesses suggested by him; (2) keep him informed about the case; (3) explain that he intended to seek an EED charge and properly investigate that defense; and (4) perform sufficiently at the Dunaway hearing. On April 21, 2005, the court denied Wilson's motion, determining that "most" of the ineffective assistance claims were "readily reviewable from the record . . . and therefore, not reviewable in a 440 motion" pursuant to § 440.10(2)(c). See Order dated April 21, 2005, People v. Wilson, Indict. No. 3814/00 (Kings County Ct. 2005). The court also found that Wilson had failed to support his claim that there were witnesses who could have substantiated an alibi and had even rebutted it himself by admitting that Simons hired an investigator who attempted to speak to some of the witnesses. Wilson's application for leave to appeal that order was denied on July 26, 2005.

      C.      Habeas Corpus

On March 10, 2005, Wilson filed the instant petition, raising two grounds for issuance of a writ of habeas corpus: (1) failure to charge the jury on extreme emotional disturbance; and (2)

ineffective assistance of trial counsel. Two weeks later, Judge Amon granted Wilson a stay so that he could exhaust the ineffective assistance claims pending in the § 440 motion, discussed supra.[3] On August 31, 2005, Judge Amon lifted the stay and ordered respondent to show cause.

On August 21, 2009, this Court directed the parties to submit supplemental memoranda addressing the ineffective assistance claims, and required Simons to file an affidavit explaining his trial strategy. Simons's affidavit explained that, although he did not remember specific conversations, based on his notes, custom of practice, and independent recollections he did have, he was confident that he discussed "all aspects" of the case with Wilson and had hired an investigator to assist him. (Affidavit of Calvin J. Simons, dated Sept. 9, 2009, Dkt #21, at ¶¶ 5-10, 17.) Simons claims that the investigator interviewed Wilson and obtained the names of "several" witnesses including Roderick Christie and Teisha Morgan. (Id. ¶ 11-14.) The investigator was able to interview Christie, but Morgan was unavailable to him. (Id.) Simons found no mention of DeSilva in his case notes (id. ¶ 2), and his affidavit is silent with regard to Morgan's brother and boyfriend.

## Discussion

### I.    The AEDPA Standard

Under the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), a writ of habeas corpus shall not issue with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication (1) was contrary to or involved an unreasonable application of clearly established federal law, as determined by the United States Supreme Court; or (2) was based on an unreasonable determination of the facts

---

[3]    The court also found that Wilson's petition was timely pursuant to 28 U.S.C. § 2244(d), because the one year statute of limitations began to run on March 3, 2004, 90 days after Wilson's application for leave to appeal his conviction was denied by the Court of Appeals. See Williams v. Artuz, 237 F.3d 147, 150-51 (2d Cir. 2001). It is undisputed now that Wilson's habeas claims are timely and exhausted.

in light of the evidence presented. 28 U.S.C. § 2254(d); see Gutierrez v McGinnis, 389 F.3d 300, 304 (2d Cir. 2004) (describing this standard as "AEDPA deference"). A state court decision is "contrary to" established federal precedent if it "contradicts the governing law set forth in [Supreme Court] cases" or arrives at a different conclusion from the Supreme Court on "materially indistinguishable" facts. Williams v. Taylor, 529 U.S. 362, 405, 120 S. Ct. 1495, 1519-20 (2000). A state court decision involves an "unreasonable application" of federal law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of" that case. Id. at 413. Further, the state court's application must have been "objectively unreasonable" for a writ to issue. Id. at 409; see Francis S. v. Stone. 221 F.3d 100, 111 (2d Cir. 2000) (explaining that the standard requires "[s]ome increment of incorrectness beyond error"). In addition, "a state court's findings of fact are 'presumed to be correct' unless rebutted 'by clear and convincing evidence.'" Drake v. Portuondo, 553 F.3d 230, 239 (2d Cir. 2009) (quoting 28 U.S.C. § 2254(e)(1)).

## II.    Refusal to Charge Extreme Emotional Disturbance

Wilson first argues the trial court erroneously refused to submit to the jury a charge on the affirmative defense of EED. Petitioner asserts that the Morgan testimony teed up a factual question as to whether he was extremely disturbed and that, had the charge been submitted, the jury would have accepted the defense and convicted him of manslaughter in the first degree.

### A.    Legal Standard

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions . . . [and] a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68, 11 S.Ct. 475, 480 (1991). To obtain the writ "on the ground of error in a state court's

instructions to the jury on matters of state law, the petitioner must show . . . that the error violated a right guaranteed to him by federal law". Blazic v. Henderson, 900 F.2d 534, 540 (2d Cir. 1990) (quoting Casillas v. Scully, 769 F.2d 60, 63 (2d Cir. 1985)); see also Cupp v. Naughten, 414 U.S. 141, 146, 94 S.Ct. 396, 400 (1973) (noting that a petitioner must show "not merely that the instruction is undesirable, erroneous, or even 'universally condemned,'" but that it violated due process).

It is settled law in the Second Circuit that a § 2254 habeas writ sought on the ground of a trial court's refusal to provide a jury instruction may issue only when three requirements are satisfied. First, petitioner must demonstrate that he was "erroneously deprived of a jury instruction to which he was entitled under state law." Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001). Second, the omission of the instruction must have "so infected the entire trial that the resulting conviction violates due process." Id. at 131 (quoting Cupp, 414 U.S. at 147, 94 S.Ct. at 400). Third, the trial court's refusal to instruct, and/or the appellate court's affirmance of the conviction, must constitute objectively unreasonable applications of the Supreme Court's rulings on due process. Id. at 124.

B.    Entitlement to the EED Charge

Under New York law, acting under the influence of extreme emotional disturbance at the time of a homicide is a statutory partial affirmative defense to murder in the second degree that reduces the criminal conduct to first degree manslaughter. N.Y. Penal Law § 125.25(1)(a); Vargas-Sarmiento v. U.S. Dep't of Justice, 448 F.3d 159, 166 (2d Cir. 2006). Entitlement to the EED instruction requires presenting the jury sufficient evidence to find that the elements of the defense have been satisfied by a preponderance of the evidence. Zamora v. Phillips, No. 04-CV-4093, 2006 U.S. Dist. LEXIS 55434, at *17 (E.D.N.Y. Aug. 8, 2006) (quoting People v. Moye,

10

66 N.Y.2d 887, 889-90, 498 N.Y.S.2d 767, 769, 489 N.E.2d 736, 738 (1985)). This entails

proving both a subjective and an objective element:

> The first, subjective element is met if there is evidence that defendant's conduct at the
> time of the incident was actually influenced by an extreme emotional disturbance. The
> second is an objective element and requires proof that defendant's emotional disturbance
> was supported by a reasonable explanation or excuse. This is determined by viewing the
> subjective mental condition of the defendant and the external circumstances as the
> defendant perceived them to be at the time, however inaccurate that perception may have
> been, and assessing from that standpoint whether the explanation or excuse for the
> emotional disturbance was reasonable.

Murden v. Artuz, 497 F.3d 178, 195 (2d Cir. 2007), cert denied, Murden v. Ercole, 552 U.S.

1150, 128 S. Ct. 1083 (2008) (quoting People v. Roche, 98 N.Y.2d 70, 76, 745 N.Y.S.2d 775,

780, 772 N.E.2d 1133, 1138 (2002)). The subjective element requires "a mental infirmity not

rising to the level of insanity at the time of the homicide, typically manifested by a loss of self-

control." Roche, 98 N.Y.2d at 75, 745 N.Y.S.2d at 780, 772 N.E.2d at 1138; see People v.

Matthews, 220 A.D.2d 822, 825, 632 N.Y.S.2d 298, 300 (3rd Dep't 1995) (noting the

"characteristic loss of control associated with this defense").

Wilson relies on two aspects of Morgan's testimony: (1) Wilson's "obsession" with his

injuries and readiness to go to jail on April 19; and (2) his allegedly being beaten and assaulted

with weapons by the victim. Viewing this evidence in the light most favorable to Wilson, the

beatings could be sufficiently traumatic to establish the objective element, but Wilson remains

unable to establish a loss of control to satisfy the subjective element. He did not testify about his

loss of control, nor did the defense present any psychiatric testimony, which, though not required

to establish EED, see Roche, 98 N.Y.2d at 76, 745 N.Y.S.2d at 780, 772 N.E.2d at 1138, can be

probative of the defense. In fact, the evidence reveals only Wilson's anger and desire for

revenge, which do not on their own support an EED charge. See Zamora, 2006 U.S. Dist.

LEXIS 55434, at *18 ("Acting out of anger or embarrassment is 'not equivalent to the loss of

self control generally associated with' [EED]") (quoting People v. Walker, 64 N.Y.2d 741, 743, 485 N.Y.S.2d 978, 979, 475 N.E.2d 445, 446 (1984)); Rice v. Hoke, 846 F.2d 160, 166 (2d Cir. 1988) ("[A]nger alone, however, does not amount to a mental infirmity or the loss of self control associated with the [EED] defense").

"In determining whether a petitioner has acted out of a loss of self control, the court will look at the petitioner's conduct before and after the homicide." Zamora, 2006 U.S. Dist. LEXIS 55434, at *18-*19. The evidence showed that Wilson was engaged in a longstanding feud with Yafa and the Albusaisi family precipitated by his illegal activities. Wilson told Morgan of his intention to kill at a social gathering involving recreational drugs more than 24 hours before the incident took place.[4] The following morning, Wilson returned to the bodega to steal beer, but he did not get violent. Hours later, he once again returned to the store and got into a fight. Even after allegedly being threatened with a machete, he returned to the store and *waited* for Yafa for 15 minutes, returning still later that night to commit the murder. These pre-murder actions militate strongly against a finding of EED. See, e.g., Rice, 846 F.2d at 166 (affirming refusal to charge EED because "the proof showed only that [defendant] was angry" where he was involved in a street fight, told his intended victim "I will be back," and returned a few minutes later with a loaded gun which he fired five times at close range); Delgado v. Walker, 798 F. Supp. 107, 114 (E.D.N.Y. 1992) (upholding refusal to charge EED because petitioner's return to scene after a

---

[4]    Wilson's statement is of limited probative value to the EED defense because the disturbance must be present "at the time of the homicide". People v. Smith, 1 N.Y.3d 610,612, 776 N.Y.S.2d 198, 199, 808 N.E.2d 333, 334 (2004). Yet, the 24 hour gap between the statement and the murder does not itself preclude Wilson's EED defense as a matter of law. See People v. White, 79 N.Y.2d 900, 903, 581 N.Y.S.2d 651, 653, 590 N.E.2d 236, 238 (1992) ("While the passage of time alone is not sufficient to defeat, as a matter of law, a claim of extreme emotional disturbance, there nevertheless remains the need for some proof that a temporally remote provocative act affected the defendant at the time of the homicide to such a degree that a jury could reasonably conclude that he acted under the influence of an extreme emotional disturbance.").

traffic accident to shoot the victim twice in the head "cannot be characterized as anything more than anger"). Moreover, Wilson's actions after the crime, such as his failure to return home and denial of involvement in the shooting, also counsel against EED.[5] See Shiwlochan v. Portuondo, 345 F. Supp.2d 242, 269 (E.D.N.Y. 2003) (explaining that "leaving the scene of the crime and taking other steps to avoid apprehension have been found to be inconsistent with the loss of control associated with an EED defense"); see, e.g., Roche, 98 N.Y.2d at 77, 745 N.Y.S.2d at 781, 772 N.E.2d at 1139 (defendant's "presence of mind" to "contrive[ ] a false explanation for the victim's wounds" and "attempt to evade detection" was found to be "conduct inconsistent with the loss of self-control").

In short, these actions do not evidence a lack of control, but merely show one who, as Wilson acknowledges, was "seething in anger" and "so enraged that he was determined to kill his assailant." (Pet'r. Br. dated Aug. 16, 2006 (Dkt # 15) at 10.) In stark contrast to Wilson's claim that his statement that he was "ready to go to jail" proves that he was "unable to listen to reason" (id.), his actions leading up to the homicide belie any sense of urgency, and his subsequent attempts to avoid detection reveal his enduring regard for self-preservation. Far from demonstrating a lack of awareness of himself or the consequences of his actions, Wilson's statement a full day before the shooting indicates, if anything, the pre-meditated nature of his crime. Although Wilson's conscious decision to accept the risk of severe punishment as a tradeoff for the instant gratification of killing Yafa is perhaps irrational – as one might expect of almost any decision to murder another human being – irrationality is not the same as being extremely emotionally disturbed.

---

[5]    Wilson's pursuit of an "inconsistent defense at trial, such as the outright denial of involvement in the crime" does not itself foreclose entitlement to an EED instruction. Roche, 98 N.Y.2d at 76, 745 N.Y.S.2d at 780, 772 N.E.2d at 1138. But, the claim of innocence obviously limited the amount of evidence that the defense presented at trial to support a finding of EED.

Due process does not require giving a jury instruction that is not supported by the evidence. Blazic, 900 F.2d at 541. As no reasonable view of the evidence adduced at trial would permit a finding of EED, this Court agrees with the trial court that Wilson was not entitled to the instruction, and the trial court's refusal to give that charge cannot support issuance of the writ.

      C.     Other Due Process Arguments

Assuming *arguendo* that Wilson was entitled to the EED charge, the trial court's failure to give the instruction in violation of state law would still not constitute a violation of due process because the denial did not "so infect[ ] the entire trial" such that it was "sufficiently harmful to make the conviction unfair". Davis, 270 F.3d at 124. The Second Circuit has found erroneous refusals to provide jury instructions constitutionally defective where the effects were "to deprive [defendant] entirely of his defense – on which he had a significant possibility of prevailing", id. at 132, or "convert[ ] a reasonable possibility of acquittal into a virtual directed verdict of conviction." Harris v. Alexander, 548 F.3d 200, 206 (2d Cir. 2008). In those trials, the defense strategy hinged on jury findings based on the instruction subsequently refused. Here, however, failure to permit the jury to consider EED did not result in an "open and shut" conviction. Id. Even if accepted, the partial affirmative defense does not permit acquittal. More importantly, the defense was conducted against the backdrop of the inconsistent theory that Wilson was not the killer. In fact, it was the testimony of a witness for the prosecution that led Simons to request the EED instruction after the close of evidence. As a result, Wilson was not deprived of his defense by the failure to provide an EED instruction. In any event, Wilson's claim that the jury would have ruled in his favor on the defense is wholly speculative and, as explained above, unlikely.

In light of these facts, the refusal to instruct on EED cannot be considered contrary to or involving an unreasonable application of Supreme Court law, or based on an unreasonable determination of the facts. Even had the trial court made a state law error, the writ cannot issue here, because the (hypothetical) error did not deprive Wilson of his federal constitutional right to due process.

## III.    Ineffective Assistance of Counsel

Wilson next argues that his trial counsel, Calvin Simons: (1) failed to investigate, interview, and call to the stand witnesses who would have offered exculpatory evidence; (2) inadequately performed at his pre-trial suppression hearing by neglecting to investigate and call one of those same witnesses and in failing to rely on controlling legal precedent; (3) failed to inform Wilson that the trial defense was to be predicated on EED, which would have been supported by the uncalled witnesses; (4) inadequately pursued the EED defense without properly investigating the governing law; and (5) failed to communicate with Wilson about trial strategy, strengths and weaknesses of the case, and whether to accept an offered plea agreement.

### A.    Legal Standard

"A criminal defendant has a high burden to overcome to prove the deficiency of counsel." Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006). Pursuant to the standard established by the Supreme Court, a petitioner must "meet both a 'performance' test, showing that counsel's representation 'fell below an objective standard of reasonableness,' and a 'prejudice' test, demonstrating that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Palacios v. Burge, 589 F.3d 556, 561 (2d Cir. 2009) (quoting Strickland, 466 U.S. at 688, 694). In assessing the objective reasonableness of counsel's performance, the Court must "indulge a strong

15

presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and "eliminate the distorting effects of hindsight." Brown v. Greene, 577 F.3d 107, 110 (2d Cir. 2009) (internal quotation marks omitted). On the other hand, in determining prejudice, a court may benefit from hindsight. Hemstreet v. Greiner, 491 F.3d 84, 91 (2d Cir. 2007), cert. denied, Hemstreet v. Ercole, 552 U.S. 1119, 128 S. Ct. 962 (2008).

For habeas petitioners, this burden of establishing ineffective assistance is "enhanced by the hurdle posed by the highly deferential review accorded state court adjudications under [AEDPA]." Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006) (quoting Eze v. Senkowski, 321 F.3d 110, 112 (2d Cir. 2003)); see also Hemstreet, 491 F.3d at 89 (explaining that defendants must show that the state court's application of Strickland "was not merely incorrect, but objectively unreasonable"). The issue, therefore, is whether the state court's rejection of Wilson's ineffective assistance claims was contrary to or an unreasonable application of federal law as "clearly established" in Strickland. Taylor, 529 U.S. at 391, 120 S. Ct. at 1512.

B.    State Procedural Bar

One ground cited by the state court for rejecting the § 440 motion was that "most" of the ineffective assistance claims were "readily reviewable from the record . . . and are, therefore, not reviewable in a 440 motion" pursuant to CPL § 440.10(2)(c). A state court's reliance on § 440.10(2)(c) may serve as an "independent and adequate procedural bar to federal habeas review," Murden, 497 F.3d at 196, unless the petitioner "can demonstrate cause for the default [on direct appeal] and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565 (1991). Wilson demonstrated neither cause nor prejudice, nor that "a constitutional violation has probably

resulted in the conviction of one who is actually innocent." Murray v. Carrier, 477 U.S. 478, 496, 106 S. Ct. 2639, 2649 (1986).

However, as the state court did not specify which of the ineffective assistance claims were barred by state procedure, this Court is wary of precluding all habeas review on these grounds. See Acosta v. Artuz 575 F.3d 177, 184 (2d Cir. 2009) (noting that the inability to review is premised on the notion that the challenges to the conviction were "clearly rejected by the state courts" on independent grounds); Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005) (habeas review is precluded "when the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar") (internal quotation marks omitted). The Court is particularly concerned with preserving habeas review in the context of Wilson's claims because, as the Second Circuit has observed, "not every ineffective assistance claim is sufficiently presented in a trial record" and "the state has not shown that state courts regularly demand compliance with [§ 440.10(2)(c)] when a defendant makes reference to uncalled witnesses". Murden, 497 F.3d at 196. Therefore, the Court will give Wilson the benefit of the doubt and consider the state court to have denied all of Wilson's ineffective assistance claims *on the merits*, permitting AEDPA review. 28 U.S.C. § 2254(d); see Acosta v. Artuz, 375 F. Supp. 2d 173, 178 (E.D.N.Y. 2005), aff'd, 575 F.3d at 177 ("There is a conclusive presumption of federal jurisdiction unless the state court clearly and expressly states that its decision relies on independent state grounds").

C.     Failure to Investigate, Interview, and Call Witnesses

Wilson's primary complaint is that Simons failed to properly investigate and interview witnesses that would have, in some way, provided exculpatory evidence. First, Wilson claims to have told Simons that his girlfriend, Cheryl DeSilva, could be an alibi witness because he was at

her apartment at the time of the homicide. After leaving DeSilva's apartment, Wilson claims to have gone straight to the house of his cousin, Andrew Christie. Wilson urged Simons to contact Christie and Christie's girlfriend "Deboral" (last name unknown), who could testify that Wilson was with them – and not Morgan – until his arrest. Wilson also provided two names to the investigator hired by Simons: Morgan's boyfriend, Usher, who would testify that neither he nor Morgan saw Wilson between April 20 and 22; and Morgan's brother, Nicholas, who would have explained that he had told his sister about the homicide.

Counsel's performance may be objectively unreasonable where, without justification, counsel fails to inquire into or follow up on leads that may lead to exculpatory evidence. See Strickland, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); Ryan v. Rivera, 21 Fed. Appx. 33, 35 (2d Cir. 2001) ("[T]he failure to interview a proposed alibi witness is unreasonable in some circumstances"). Nonetheless, Wilson's burden in showing Simons's ineffectiveness is a heavy one. "Courts applying Strickland are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury. The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess." Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005) (internal quotation marks omitted).

Upon review of the record, this Court finds that Wilson has not rebutted the presumption of effectiveness; nor has he established to the contrary, that Simons's investigation or subsequent decisions to call or not call specific witnesses were unreasonable. Wilson admits that Simons hired an investigator who reached out to several witnesses who wouldn't speak to him. His claims that Simons and the investigator simply ignored his pleas to contact certain witnesses are

supported by nothing other than his own self-serving "recollections." See Wells, 417 F.3d at 322 ("In nearly every case that concludes that counsel conducted a constitutionally deficient investigation, the courts point to *readily available evidence* neglected by counsel") (emphasis added); McLean v. Green, No. 05-CV-5603, 2009 U.S. Dist. LEXIS 122079, at *47 (E.D.N.Y. Apr. 15, 2009) (finding petitioner's "conclusory assertions" that his attorney did not investigate witnesses with alleged exculpatory testimony "are insufficient to overcome the strong presumption that counsel acted reasonably"). Additionally, the mere fact that Simons lacks specific recollection as to events that took place 10 years ago does not bolster Wilson's speculation. In fact, the Second Circuit defended Simons in another habeas decision regarding reasonable investigation, stating that: "Time inevitably fogs the memory of busy attorneys. That inevitability does not reverse the Strickland presumption of effective performance. Without evidence establishing that counsel's strategy arose from the vagaries of ignorance, inattention or ineptitude, Strickland's strong presumption must stand." Wells, 417 F.3d at 326 (internal quotation marks and citations omitted).

Wilson also has not demonstrated constitutionally significant prejudice from the alleged failure to investigate. He conjectures that these witnesses would have affected the outcome of his trial, but he has not submitted any affidavits or written statements from them indicating that they were even willing to testify or the substance of their testimony. See Black v. Goord, 419 F. Supp. 2d 365, 380-81 (W.D.N.Y. 2006) (petitioner's citation to his own affidavit in support of a claim that three un-interviewed witnesses would have provided exculpatory testimony was "plainly insufficient" to establish ineffective assistance); Muhammad v. Bennett, No. 96-CV-8430, 1998 U.S. Dist. LEXIS 5920, at *2 (S.D.N.Y. Apr. 29, 1998) (holding that "petitioner's speculative claim about the testimony of an uncalled witness is accorded little weight in federal

habeas review"). In fact, it is unlikely that Morgan's brother or boyfriend would have directly contradicted Morgan's sworn testimony.

Even if Wilson had provided affidavits, the totality of the evidence at trial renders it unlikely that his conviction would have been substantially undermined. "Where the Second Circuit has found insufficient prejudice, the evidence against defendants was very strong, and counsel's error (or purported error) minor in comparison." Schulz v. Marshall, 528 F. Supp. 2d 77, 100 (E.D.N.Y. 2007). As the trial court explained, there was ample evidence upon which to convict Wilson, including the fact that Wilson and Yafa had fought prior to the shooting, Ali's testimony that he saw Wilson fire the weapon, and Morgan's testimony about Wilson's state of mind both before and after the murder. The alleged testimony of Christie, "Deboral", Usher, and Nicholas would do nothing to undermine Ali's eyewitness account, and each of these defense witnesses would have been subjected to heavy impeachment for bias as a friend or relative of Wilson. The same impeachment risk exists for DeSilva, the only witness who would allegedly serve as an alibi at the time of the homicide. In sum, there are far too many contingencies to reasonably presume that the testimony of these witnesses would have changed the jury verdict.

D.    Inadequate Performance at Pre-Trial Hearing

Wilson's argument that Simons was ineffective during the Dunaway portion of the pre-trial evidentiary hearing is derivative of the above claim that Simons did not investigate witnesses. Wilson argues that had Simons properly followed up with Nicholas, he would have learned that Teisha Morgan – as she testified at trial – first learned about the homicide from him. Therefore, Wilson contends, the credibility of Morgan's information to police prior to the arrest would be cast into doubt, requiring Simons to urge the trial court to apply the higher Aguillar-Spinelli "totality of the circumstances" standard for probable cause. Aguilar v. Texas, 378 U.S.

108 (1954); <u>Spinelli v. United States</u>, 393 U.S. 410 (1969). The claim retreads Wilson's argument in his *pro se* supplemental brief on direct appeal that the Appellate Division found both "unpreserved" and "without merit." Wilson now attempts to avoid the state court's decision by spinning the claim from one of failure of the court to one of failure of his counsel. Once again, however, Wilson does not adequately support his contention.

The Court has already determined that Simons's "performance" was not ineffective for any alleged failure to investigate Nicholas, which includes any alleged consequences of such a "failure" at the pre-trial hearing. Review of the hearing transcript, moreover, reveals that Simons was competent and well-prepared in cross-examining witnesses and in argument; he was even able to win suppression of Wilson's videotaped statement. With respect to "prejudice," Wilson, as noted previously, provides no affidavit from Nicholas regarding his testimony, and even if Simons did interview Nicholas and was able to make a good faith <u>Aguilar-Spinelli</u> argument, there is no reason to suspect that the trial court would have reached a different conclusion on the suppression issue. That Morgan may have learned about the homicide from Nicholas does not contradict or undermine her statement to police that Wilson confessed to her,[6] and even under the "totality of the circumstances" test the trial court's analysis on the record indicates that the ample probable cause the court found would be unaffected by the substance of what Nicholas allegedly had to say.

E.    Counsel's Role in the EED Defense

Two of Wilson's claims regard alleged deficiencies in Simons's performance in pursuit of the EED defense. Both are completely without merit.

---

[6]    Wilson implies that since Nicholas was also a "suspect to the crime", police should have doubted Morgan's testimony because she was protecting her brother. However, the testimony of several police officers thoroughly debunked the theory that Nicholas was ever considered a suspect for the homicide of Yafa.

First, Wilson argues that Simons failed to inform him that the trial defense was to be "predicated" on EED, and that this defense would have been supported by the uninterviewed witnesses. As an initial matter, Wilson does not explain how any witness other than Morgan, who did testify, would have affected the EED defense. More importantly, Wilson's defense was never predicated on EED. Simons argued, consistent with Wilson's statement to police, that Wilson was not the killer. Simons only pursued an EED charge after hearing Morgan's potentially relevant testimony at trial. Since every aspect of Wilson's defense to that point was predicated on his innocence rather than his state of mind, Simons's decision to forego EED until the charge conference is a classic strategic decision that this Court will not second-guess.

Second, Wilson argues that Simons inadequately pursued the EED defense without proper investigation into the governing law. However, the record reflects Simons's spirited and well-reasoned argument for the EED charge, and even the prosecutor consented to his request. That the court ultimately (and correctly) rejected Simons's argument does not render his performance constitutionally ineffective. See United States v. Di Tommaso, 817 F.2d 201, 215 (2d Cir. 1987) (noting that a court "will not second-guess trial counsel's defense strategy simply because the chosen strategy has failed").

F.    Failure to Keep Wilson Properly Informed

Finally, Wilson faults Simons for generally failing to keep him apprised about strategy and developments in the case. Specifically, he alleges that he was unable to make an informed decision about whether to accept the prosecution's plea offer of a 20 years to life sentence.

Effective assistance encompasses offering a defendant advice on the question of whether to plead guilty. Purdy v. United States, 208 F.3d 41, 44 (2d Cir. 2000). "As part of this advice, counsel must communicate to the defendant the terms of the plea offer and should usually inform

the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." Id. at 45 (internal citations omitted). Wilson admits that he discussed the case with Simons at least three times via satellite, and that the plea offer was at least mentioned. Simons has explained that in the "regular course" of his practice he always discusses with clients the strengths and weaknesses of a case and chances for success at trial. Simons also stated that he was "certain" that he "discussed all offers in conjunction with the evidence in the case with Mr. Wilson on several occasions." (Simons. Aff. ¶18.) Wilson's vague allegation that "[c]ounsel had not informed defendant further than the bare-bones" of the plea agreement does not establish by a preponderance the truth of his contention or that representation was constitutionally defective.

Even assuming for purposes of argument that Simons did not provide sufficient advice regarding the plea offer, Wilson has not established any prejudice, because he has not shown a "reasonable probability that but for counsel's errors in considering or explaining a plea offer, he would have accepted the offer." Muyet v. United States, No. 03-CV-4247, 2009 U.S. Dist. LEXIS 73927, at *12 (S.D.N.Y. Aug. 19, 2009) (internal quotation marks omitted). As an initial matter, Wilson does not now even assert that he would have accepted the offered plea. Rather, in his § 440 brief, he claims that had he been properly informed, he would have attempted to bargain with the prosecution for a lower sentence such as 15 years. Obviously, Wilson has no basis for speculating that the prosecution would have offered any such deal. Moreover, even if Wilson had asserted that he would have taken the existing offer, he does not support his assertion with any "objective evidence" that could permit this court to find prejudice. Raysor v. United States, No. 03-CV-5418, 2009 U.S. Dist. LEXIS 76101, at *5 (E.D.N.Y. Aug. 26, 2009) (noting that a petitioner "may not rely solely upon self-serving, post-conviction testimony that he would

23

have accepted the plea"). The plea offer was not so different from the sentence Wilson ultimately received such that the Court can say it was unreasonable to roll the dice and seek an acquittal, even though the case against him was strong.

## IV. Evidentiary Hearing

Wilson argues that he is entitled to an evidentiary hearing on the ineffective assistance claims because his allegations set up a "factual dispute between Petitioner's memory of Simons's representation and Simons's version." (Pet'r Supp. Br., dated Oct. 26, 2009 (Dkt # 22) at 9.) As the Court explained in the August 20 Order, "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." Drake v. Portuondo, 321 F.3d 338, 345 (2d Cir. 2003) (internal quotation marks omitted). By ordering Simons to produce his affidavit, the Court "offer[ed] the asserted ineffective attorney an opportunity . . . to present evidence." Spearman v. Edwards, 154 F.3d 51, 52 (2d Cir. 1998).

Given the record's amplification by the Simons affidavit, no further evidentiary hearing is necessary or appropriate to resolve Wilson's claims. See Chang v. United States, 250 F.3d 79, 85-86 (2d Cir. 2001). The Simons affidavit and, indeed, Wilson's factual allegations provide sufficient detail for this Court to determine that Wilson's claims fail merit analysis. See, e.g., Crisci v. United States, 108 Fed. Appx. 25, 27 (2d Cir 2004) (finding no abuse of discretion where district court bypassed hearing and concluded that counsel adequately informed defendant of a plea where he submitted affidavit stating that his "practice" was to inform "every client" about sentencing); Malpeso v. United States, 38 Fed. Appx. 45, 47 (2d Cir. 2002) (finding district court did not abuse discretion by denying live testimony where counsel submitted an

24

affidavit stating that she had no recollection of being informed about potential alibis and that he routinely took notes on such matters in his practice). Here, an evidentiary hearing would "add little or nothing to the written submissions", Chang, 250 F.3d at 86, because Simons exhausted his recollections and case notes from a 10 year-old trial, and Wilson relies only on his own 10 year-old recollections. Consequently, a hearing "would not offer any reasonable chance of altering [the Court's] view of the facts." Id.

## Conclusion

For all of the foregoing reasons, Wilson's petition for a writ of habeas corpus is dismissed with prejudice and the writ is denied. Since Wilson has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. 28 U.S.C. § 2253(c)(2). Additionally, the Court certifies pursuant to 28 U.S.C. § 1915(a) that any appeal from this Memorandum and Order would not be taken in good faith and therefore *in forma pauperis* is denied for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 920-21 (1962).

The Clerk of the Court is directed to enter judgment and to close this case.


SO ORDERED.

Dated: Brooklyn, New York
       February 12, 2010


ERIC N. VITALIANO
United States District Judge